

# SUPREME COURT OF MISSOURI
## en banc

| | |
|---|---|
| CHEIKH SECK, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | No. SC93628 |
| ) | |
| DEPARTMENT OF TRANSPORTATION, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| DIVISION OF EMPLOYMENT SECURITY, ) | |
| ) | |
| Respondent. ) | |

### APPEAL FROM THE DECISION OF THE
### LABOR AND INDUSTRIAL RELATIONS COMMISSION

*Opinion issued May 27, 2014*

The Missouri Department of Transportation ("MoDOT") fired Cheikh Seck for

falsifying his doctor's return-to-work certificate.  The Labor and Industrial Relations

Commission ("the Commission") determined that Seck was disqualified from receiving

unemployment benefits under section 288.050.2[1] because he had been discharged for

misconduct connected with his work.  Seck appeals, and the Commission's decision is

affirmed.

---

[1]   Unless otherwise noted, the statutes cited herein are found in RSMo 2000 or the 2013
supplement thereto.

## I.     *Facts*

In July 2010, Seck was hired by MoDOT as a bridge maintenance worker. Typically, he worked Monday through Thursday, 10 hours per day. In February 2011, Seck injured his right thumb. Later, he developed pain in his shoulder when operating a jackhammer. Seck did not tell MoDOT about these injuries when they occurred, however, because he mistakenly believed that he was not eligible for workers' compensation benefits until he had been employed for one year. In July 2011, when he reported these injuries to his supervisor, Seck was told to take sick leave and see his personal physician. Seck was absent from work beginning July 18, 2011, and did not return until August 8, 2011.

On July 19, Seck saw Dr. Allen about his thumb and shoulder. She ordered x-rays of his thumb and recommended physical therapy for his shoulder. Dr. Allen also prescribed cyclobenzaprine (a muscle relaxant) and told Seck he was to take one pill every six hours "as needed" for pain or muscle spasms in his shoulder. Dr. Allen told Seck he could return to work the next day (i.e., July 20) but recommended that he request light duty. Finally, Dr. Allen warned Seck not to operate heavy machinery after taking a muscle relaxant.

Seck conveyed Dr. Allen's recommendations to his supervisor, who told him that "light duty" was not available for Seck's job classification. In addition, the supervisor told Seck that he could not return to work until his doctor completed a return-to-work certificate, on MoDOT's form, that demonstrated Seck was able to work with no restrictions. Instead, after several days, Seck submitted to MoDOT a short, handwritten

note from Dr. Allen that stated: "Pt. is OK to return to work on 07-27-11 without restrictions." Seck's supervisor again told him that his doctor needed to complete MoDOT's return-to-work form and gave him copies of the proper form for the doctor to complete.

On July 28, Seck submitted a MoDOT return-to-work certificate, signed by Dr. Allen, which stated that Seck could resume working on July 29. Dr. Allen's certificate also stated that Seck should not use a jackhammer or push/pull more than 20 pounds, and the doctor warned that Seck should not drive after taking a muscle relaxant. Seck's supervisor again explained that he could not return until his doctor certified he was able to return to work with no restrictions.

Finally, on August 3, Seck submitted another return-to-work certificate. This certificate, signed by Dr. Allen on August 2, eliminated all of the restrictions from the July 28 certificate and verified that Seck was able "to return to work without restrictions."[2] At the bottom of this certificate, however, in the same area where Dr. Allen previously had included her handwritten restrictions, the certificate contained the following handwritten notation: "finish medecine [sic] and return to work on 8/8/."

Suspicious about the misspelling, MoDOT contacted Dr. Allen's office to see if she had written the note stating that Seck could not return until August 8 because he needed to finish his medication. MoDOT was assured not only that Dr. Allen did not write this statement but also that the statement had been added to the form after Dr. Allen signed the certificate and cleared Seck to return to work on August 2 with no restrictions.

---

[2] A copy of Dr. Allen's August 2 certificate is included as an appendix to this opinion.

3

When asked about this notation upon returning to work on August 8, Seck admitted that he had altered the certificate after Dr. Allen signed it. As a result, MoDOT terminated Seck on September 8, 2011, for falsifying Dr. Allen's return-to-work certificate.

Later, MoDOT objected to Seck's application for unemployment benefits on the ground that Seck had been fired for "misconduct connected with [his] work." The Division of Employment Security (the "Division") deputy agreed and denied Seck's application pursuant to section 288.050.2. Seck sought review by the Division's appeals tribunal. Following a telephone hearing, the tribunal affirmed the deputy's decision that Seck had "falsified his doctor's note" and, therefore, had been discharged for "misconduct connected with [his] work." Seck then petitioned the Commission to review the tribunal's decision. The Commission found the decision of the appeals tribunal was "supported by the competent and substantial evidence on the whole record" and was "in accordance with the relevant provisions of the Missouri Employment Security Law." Accordingly, the Commission affirmed the tribunal's decision and adopted as its own the tribunal's factual findings and legal conclusions.

Seck now seeks judicial review of the Commission's decision under section 288.210. The Division acts as the respondent in such an appeal, *see* section 288.210, but appears in support of the public interest and not on behalf of the employer. After granting transfer pursuant to Rule 83.04, this Court has jurisdiction, *see* Mo. Const. art. V, § 10, and affirms the Commission's denial of Seck's unemployment benefits.

4

## II.     *Standard of review*

The Missouri Constitution guarantees the right of judicial review of administrative decisions affecting the substantive rights of individuals.  Mo. Const. art. V, § 18. Section 288.210 provides that this constitutional right may be exercised by filing a notice of appeal with the Commission and sets forth the standard of review that courts must apply:

> The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law.

§ 288.210.

This statute identifies various grounds on which a reviewing court may overturn a Commission decision.  The two grounds invoked by Seck are:

> The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:
> ….
> (3) That the facts found by the commission do not support the award; or
>
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

*Id.*

Seck contends that, under subdivision (4), there is insufficient competent evidence in the record to support the Commission's finding that Seck falsified his medical return-to-work certificate.  Even if the evidence supports the facts found by the Commission, Seck also contends under subdivision (3) that those facts do not constitute "misconduct connected with [his] work" under section 288.050.2.  The standard of review for this second argument is *de novo* because it raises only a question of law.  *See Fendler v.*

5

*Hudson Servs.*, 370 S.W.3d at 588-89 ("Whether the Commission's findings support the conclusion that a claimant engaged in misconduct connected with his or her work is a question of law"). The standard of review for Seck's first argument, however, is more complex.

Following a bench or jury trial, an appellate court determines whether the evidence was sufficient to support the facts found by reviewing only the evidence and reasonable inferences that support those findings and, in doing so, it examines them in the light most favorable to those findings. When an administrative agency makes factual determinations that affect private rights, however, the Missouri Constitution guarantees greater judicial scrutiny.

Article V, section 18, guarantees the right of judicial review and requires that agency findings be "supported by competent and substantial evidence ***upon the whole record***." [Emphasis added.] As a result, a court reviewing factual findings by an administrative agency must consider all of the evidence that was before the agency and all of the reasonable inferences that may be drawn from that evidence, including the evidence and inferences that the agency rejected in making its findings. *Fendler*, 370 S.W.3d 585, 588 (Mo. banc 2012) (court must "examin[e] the evidence in the context of the whole record").

Even though the constitution requires courts to give greater scrutiny to administrative fact findings than it does to facts found by a jury or judge, it does not authorize a reviewing court to substitute its judgment for that of administrative agency being reviewed. Section 288.210 reinforces this point, with the result that courts must:

6

(1) defer to the Commission's credibility determinations and, (2) in the absence of fraud, accept all factual determinations made by the Commission that are supported by the evidence on the record as a whole.

### III.    The Commission Properly Found that MoDOT Fired Seck for Falsifying the Certificate Signed by Dr. Allen

As noted above, the Commission adopted the appeals tribunal's decision in this case, including the following findings and conclusions:

> On August 2, 2011, the claimant was released to work without restriction by his physician. **Claimant falsified the doctor's note** by writing on the document that he was released to return to work on August 8, 2011 …. Claimant asserts he wanted to return to work. However, the claimant changed his return to work date from August 2, 2011 to August 8, 2011. Claimant was not credible …. [He] was discharged on September 8, 2011 for **misconduct connected to his work**." [Emphasis added.]

At the hearing before the tribunal, Seck admitted that he altered the return-to-work certificate after it was signed by Dr. Allen on August 2 and that he submitted the altered certificate to MoDOT on August 3. The certificate that Dr. Allen signed demonstrated that Seck able to return to work on August 2 with no restrictions. After Seck's alteration, however, the certificate stated that Seck could not return until August 8 because he needed to finish his medication. Seck made his alteration directly above Dr. Allen's signature, in the part of the form where Dr. Allen previously had included handwritten restrictions, and immediately below space provided for the doctor to identify any "Restrictions or Instructions Related to Prescription Medications." Finally, Seck does not contest – and his testimony plainly demonstrates – that he understood his doctor's certificate was an important part of MoDOT's return-to-work procedure when he

7

submitted the altered certificate to MoDOT on August 3. Collectively, this evidence gives rise to reasonable inferences that Seck intended for his alteration to be understood by the reader as a statement by Dr. Allen that Seck was allowed to return to work only on and after August 8. Accordingly, had a judge or jury found that Seck had "falsified his doctor's note," there is no doubt that the evidence was sufficient to support that finding.

But Seck does not contend that the evidence was insufficient for the Commission to find that he "falsified his doctor's note." Instead, Seck contends that the Commission's finding is not supported by the "record as a whole" because it ignores Seck's explanation that he altered the certificate only to reflect an "agreement" that his supervisor made after Dr. Allen signed the certificate. Seck argues that he called his supervisor on August 3 and told him that, even though Dr. Allen had certified he was able to return to work without restrictions, he wanted to delay his return until August 8 so he could take the last of the muscle relaxants that Dr. Allen had prescribed for him on July 19. Seck claims that he altered the certificate solely to reflect his supervisor's agreement to this delayed return and not, as the Commission found, to create the impression that the delay was required by Dr. Allen.

MoDOT declined to participate in the hearing before the appeals tribunal and, therefore, did not present any evidence contradicting Seck's version of the conversation with his supervisor. As a result, Seck contends that, unless the Commission explicitly rejects his explanation of the alteration on credibility grounds, it is prohibited from finding any fact that is inconsistent with that explanation. In other words, Seck maintains that the "record as a whole" cannot support the Commission's finding that he "falsified

8

the doctor's note" because of Seck's uncontradicted evidence that: (1) his MoDOT supervisor agreed to Seck's delayed return even though the certificate from Dr. Allen authorized him to return to work immediately and (2) the purpose and effect of Seck's notation on the certificate was not to attempt to alter the substance of Dr. Allen's clearance but, instead, simply to reflect this agreement by his supervisor. Even though the Court is bound by the Commission's credibility determinations, Seck argues that such determinations must be explicit and must refer specifically to the testimony being rejected. This Court has rejected this argument in other contexts. *See, e.g., State v. Milliorn*, 794 S.W.2d 181, 184 (Mo. banc 1990) (deferring to trial court's credibility determination, noting only that it "ostensibly found the trooper's testimony incredible"). But the Court need not resolve that issue here because Seck's characterization of the evidence below is not accurate.

In his hearing before the appeals tribunal, Seck did not testify that his MoDOT supervisor agreed to extend his return-to-work date to August 8, nor did Seck testify that his alteration to Dr. Allen's certificate was intended to reflect that agreement. Instead, even though he testified that Dr. Allen had cleared him "to go to work as of August 2, 2011, without restrictions," Seck repeatedly testified that he decided to alter the certificate to delay his return until August 8 because he wanted time to finish taking the muscle relaxants that Dr. Allen had prescribed on July 19. Seck admitted that he wanted Dr. Allen to change his return date, but decided in the end to make that change himself because he was afraid to ask Dr. Allen for any more changes:

9

Seck: And when they [MoDOT] approach me, tell me who wrote this [notation on the certificate], I don't have to lie. I be honest and tell them – I'm open, honest, I wrote it. And say why? I say I just want to finish my medicine. I [had left] like two, three pills, four pills (unintelligible) ….

ALJ: Why didn't you ask your doctor to give you until whatever day it was, you know, August 8, that you wanted … to go back to work instead of 8/2? Why didn't you ask your doctor to put it on the document instead of you?

A: You know, the doctor was kind of mad because back and for[th]. I – I don't want to – I don't – I was disturbing him too much because my supervisor was making me back and for[th] all the time. And I was not – he was so – he was kind of – kind of nervous after that, kind of – kind of mad because I was coming back and for[th]. He say, okay, you know, I don't want to ask him no more questions because I don't want to make him mad. And because of my supervisor…. And that's why I wrote this and to finish my medicine.[3]

Seck admitted that Dr. Allen never told him that he needed to finish his medicine before returning to work. More importantly, Seck did not testify – and he does not now argue – that he misunderstood the instructions that Dr. Allen gave him on July 19 when she prescribed the muscle relaxants, i.e., that he was to take them only "as needed" for spasms or pain. Finally, Seck admitted that – when Dr. Allen certified on August 2 that he was able to return to work with no restrictions – he did not ask if this was meant to change the doctor's original instructions. Accordingly, there is no evidence that Dr. Allen required Seck to finish this medication before returning to work or that Seck believed – if only mistakenly – that he was supposed to do so. Instead, as Seck admitted, he "wanted" to delay returning to work until August 8 because he only had a couple of the pills left and he "wanted" to finish taking them before going back to work.

---

[3] Seck's native language is French. He does not claim that he had any difficulty understanding the questions or making his answers understood at the hearing, however, nor does he claim that the Division's appeals tribunal misunderstood his testimony.

Not only is Seck's argument on appeal not supported by his testimony at the hearing, it is inconsistent with Seck's written request that the appeals tribunal review the Division deputy's decision. There, rather than claim that he altered Dr. Allen's certificate merely to reflect an agreement by his MoDOT supervisor that he could return to work later than his doctor said he could, Seck explained that – because this supervisor told him "to report for work while still on [the muscle relaxants]" – Seck "wrote a note on the bottom of the [certificate] *that Dr. told me to finish the medicine* before I operate machinery." [Emphasis added.] As noted above, however, there was no evidence at the hearing that Dr. Allen ever told Seck this or that Seck mistakenly believed this was true. Instead, Seck admitted at the hearing that Dr. Allen never told him that he needed to finish taking his muscle relaxants before returning to work, and MoDOT confirmed with Dr. Allen that Seck was not required to do so.

In sum, therefore, Seck's argument on appeal that he altered Dr. Allen's certificate merely to reflect an agreement with his MoDOT supervisor is not supported by the record. Instead, after considering "the whole record," the Court holds that sufficient competent and substantial evidence supports the Commission's finding that Seck "falsified his doctor's note," including evidence: (1) that Seck's own statements provide contradictory reasons for altering Dr. Allen's certificate; (2) that Seck phrased his alteration as a requirement from his doctor, not as an agreement separate from (and inconsistent with) his doctor's conclusions reflected throughout the rest of the certificate; (3) that Seck did not sign or initial his alteration (let alone adding the note to the facsimile cover sheet or separate sheet of paper rather than including it on the certificate

11

itself), as he might be expected to do if he wanted the reader to understand that the note he added was not part of Dr. Allen's certificate; and (4) that Seck added his note in that part of the form where the doctor is supposed to write in any prescription-related restrictions and, more importantly, in the same place where Dr. Allen had written such a restriction in the certificate she signed for Seck on July 27. Accordingly, the Court affirms the Commission's findings that Seck "falsified" Dr. Allen's return-to-work certificate before submitting it to MoDOT and that MoDOT fired Seck for that action.

## IV. The Commission Properly Concluded that Seck was Discharged for "Misconduct Connected with [His] Work"

Seck also argues that, even if the Commission properly found MoDOT fired him for falsifying the return-to-work certificate signed by Dr. Allen, the Commission erred in concluding that this constituted "misconduct connected with [his] work" for purposes of section 228.050.2. First, Seck contends that falsifying Dr. Allen's certificate was not "misconduct" under section 228.030.1(23) because his actions were not "willful." Second, Seck contends that falsifying Dr. Allen's certificate was not "connected with [his] work" because MoDOT suffered no actual prejudice as a result. These arguments challenge the Commission's legal conclusions based on the facts as it found them rather than challenging the findings themselves. Therefore, the Court reviews these claims *de novo*, i.e., without deference to the Commission or its conclusions.

### A. Willfulness is Not Required for All Forms of Misconduct

As a general matter, unemployment benefits are reserved for "persons unemployed through no fault of their own." § 288.020.1. Under section 228.050.2, therefore, a

12

claimant is not eligible for these benefits if he was "discharged for misconduct connected with the claimant's work." Though the claimant has the burden of proving his right to receive unemployment benefits in the first instance, the employer bears the burden of proving that the applicant is ineligible because he was discharged for misconduct connected with his work. *Fendler*, 370 S.W.3d at 589.

Section 228.030.1(23) identifies four separate categories of work-related behavior that qualify as "misconduct" for purposes of section 228.050.2:

> [1] an act of wanton or willful disregard of the employer's interest,
>
> [2] a deliberate violation of the employer's rules,
>
> [3] a disregard of standards of behavior which the employer has the right to expect of his or her employee, or
>
> [4] negligence in such degree or recurrence as to [a] manifest culpability, wrongful intent or evil design, or [b] show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer."

§ 228.030.1(23) (bracketed numbers added for clarity).

*Fendler* examines this definition and finds that the four categories of "misconduct" focus on different conduct and require different degrees of scienter. *Id.* at 589-90. Under the first category, for example, even a single act taken in disregard of the employer's interests can constitute misconduct for purposes of section 228.030.1(23), but only if the employee's disregard for that interest is "wanton or willful." Under the fourth category, however, simple negligence can constitute misconduct, but only if the nature or number of the employee's action demonstrates either: (a) that it was the employee's motive or purpose to injure the employer's interests, or (b) that the employee's disregard

13

of those interests (or of employee's duties and obligations) was both "intentional and substantial." *Id.*

The Court in *Fendler* was not called upon to construe the second or third categories of section 228.030.1(23), but the analysis is the same. Under the second category, an employee's violation of the employer's express (i.e., oral or written) rules is misconduct only if the employee's violation was "deliberate." Finally, even in the absence of an oral or written rule, an employee commits misconduct under the third category in section 228.030.1(23) if he disregards the "standards of behavior which the employer has a right to expect" from its employees.

Seck argues that his conduct in falsifying Dr. Allen's return-to-work certificate does not fall within this third category of misconduct because there was no basis for the Commission to conclude that his misconduct had been "willful." This argument must fail, however, because it has no basis in the plain language of section 228.030.1(23). As this Court held in *Fendler*, the mental state required for each of the categories of misconduct is only that which is set forth in the statute. *Id.* at 589-90. The "disregard" in the third category of misconduct under section 228.030.1(23) is not limited to "wanton or willful disregard" (as in the first category), nor to "intentional and substantial disregard" (as in the fourth category), nor is there even an explicit requirement that the conduct be "deliberate" (as in the second category). Accordingly, the plain language of this statute

14

does not support Seck's attempt to take a requirement from one of the other categories of misconduct under section 228.030.1(23) and make it a requirement of the third category.[4]

However, given the remedial nature of the purposes of unemployment benefits, it is clear that the third category of section 228.030.1(23) is not intended to preclude benefits for every employee who is discharged merely because his conduct fell short of his employer's expectations. As noted above, other categories of "misconduct" are limited by the nature of the employee's disregard (i.e., by requiring disregard that is "intentional and substantial" or "wanton or willful"). The third category, on the other hand, is limited by the relatively few standards to which it refers. The third category applies only to those "standards of behavior which the employer has a right to expect" from its employees, which means that the application of this category is restricted to those basic "standards of behavior" that apply universally in the workplace. Unlike the second category, therefore, which applies only to violations of express rules of which the employee has been given notice, the third category applies only to those standards of behavior for which no such notice is needed because they are fairly understood by both the employer and the employee even where not included in the employer's express rules.

### B. Seck Disregarded a Standards of Behavior that MoDOT has a Right to Expect from its Employees

---

[4] Notwithstanding the plain language of the statute, some decisions have held that "a disregard of the standards of behavior that an employer has the right to expect" must still be willful or intentional in order to constitute misconduct under section 228.030.1(23). *See, e.g.*, *Nevettie v. Wal-Mart Associates, Inc.*, 331 S.W.3d 723, 729 (Mo. App. 2011); *Bostic v. Spherion Atl. Workforce*, 216 S.W.3d 723, 725-26 (Mo. App. 2007); *Murphy v. Aaron's Auto. Products*, 232 S.W.3d 616, 621-22 (Mo. App. 2007). In the future, such cases should not be followed.

15

This case falls squarely within the third category of section 228.030.1(23).  Even though it apparently is not stated among its express rules for employees, MoDOT – like all employers – is entitled to expect that its employees will not falsify medical certificates required from and signed by the employees' physicians.  By the same token, Seck knew that this standard of behavior was expected of him.  As shown above, Seck knew that MoDOT would not let him return to work until Dr. Allen completed and signed the return-to-work certificate, and Seck knew that the purpose of the certificate was for MoDOT to know whether Seck's doctor believed he was able to return to work with no restrictions.  Seck disregarded that standard of behavior by altering Dr. Allen's certificate and then submitting it to MoDOT as though the statement he added had come from her.  Accordingly, the Commission did not err in concluding that Seck's conduct in "falsifying his doctor's note" constituted "misconduct" under section 228.030.1(23).

## C. Seck's Misconduct was "Connected to [his] Work"

Finally, even if an employee is discharged for actions that constitute "misconduct" under section 228.030.1(23), the employee is not ineligible to receive unemployment benefits under section 288.050.2 unless the misconduct was "connected to the claimant's work."  Seck argues that falsifying Dr. Allen's return-to-work certificate was not "connected to [his] work" because his misconduct did not harm MoDOT.  Specifically, Seck claims that he received no more sick leave – paid or unpaid – as a result of falsifying Dr. Allen's certificate than he otherwise was entitled to receive.  Because MoDOT failed to show that it was harmed, or that Seck obtained some benefit to which

16

he was not entitled, Seck claims that the misconduct in falsifying his doctor's note was not "connected to" his work with MoDOT.

The Court rejects Seck's construction of the "connected to" requirement in section 288.050.2.  As with the argument that proof of "willfulness" is required for every category of misconduct under section 288.030.1(23), the argument that proof of harm to the employer is required before misconduct can be "connected to the claimant's work" finds no support in the plain language of the statute.  Even though the "connected to" language in section 288.050.2 protects an employee's right to receive benefits after being discharged for misconduct that had no relationship to his work, the statute demands only that there be such a relationship, i.e., that the misconduct and the work be "connected." Nothing in the statute requires – or even suggests – that there must be proof of harm to the employer resulting from the employee's misconduct, and the Court holds that no such proof is required.

There is no question that Seck's misconduct was "connected to" his work with MoDOT.  Seck understood that Dr. Allen's medical certificate controlled whether – and when – he would be allowed to return to work at MoDOT, and he changed the date of that return when he falsified that certificate.  Accordingly, the Commission did not err in concluding that Seck was discharged for misconduct "connected to [his] work."

17

*V.*    *Conclusion*

For the reasons set forth above, the Commission's decision is affirmed.


_____
Paul C. Wilson, Judge

All concur.



Note:  The Court's appendix is on the following page.

*Court's Appendix:*

06/22/2011   89:16   816-942-0387     HOLMESWOOD APTS     PAGE 82

## MISSOURI DEPARTMENT OF TRANSPORTATION
## OFF-WORK/RETURN TO WORK MEDICAL CERTIFICATION

**Note to Physician: Complete this form and return to patient at end of visit. Keep copy for your file.

NAME: Cheikh Seck      SOCIAL SECURITY #:

DIAGNOSIS: ① Shoulder Strain      DATE OF INJURY:

MEDICAL STATUS: ☐ MAX. MED. IMPROVEMENT ☐ IMPROVED ☐ SAME ☐ WORSE    WORK RELATED: ☐ YES ☐ NO

☐ RETURN TO WORK WITHOUT RESTRICTIONS
☐ TODAY ☐ TOMORROW (INCLUDES SATURDAYS, SUNDAYS, HOLIDAYS)
☐ DATE CAN RETURN:

☐ RETURN TO WORK WITH RESTRICTIONS. IF NOT FOR FULL DAYS, HOURS/DAY:
☐ TODAY ☐ TOMORROW (INCLUDES SATURDAYS, SUNDAYS, HOLIDAYS)
☐ DATE CAN RETURN:

| | SEDENTARY 0-10# | LIGHT 11-19# | MEDIUM 20-50# | HEAVY OVER 50# | | SEDENTARY 0-10# | LIGHT 11-19# | MEDIUM 20-50# | HEAVY OVER 50# |
|---|---|---|---|---|---|---|---|---|---|
| FLOOR TO WAIST | ☐ | ☐ | ☐ | ☐ | SHOULDER TO OVERHEAD | ☐ | ☐ | ☐ | ☐ |
| WAIST TO SHOULDER | ☐ | ☐ | ☐ | ☐ | CARRY | ☐ | ☐ | ☐ | ☐ |

| | | (HOURS AT ONE TIME) | | | | | (TOTAL HOURS DURING DAY) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0-2 | 2-4 | 4-6 | 6-8 | 8-10 | 0-2 | 2-4 | 4-6 | 6-8 | 8-10 | OVERTIME |
| STAND/WALK | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| SIT | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| DATA ENTRY/TYPING | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| SIMPLE GRASPING | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TWIST | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| BEND | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| SQUAT | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| KNEEL | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| CLIMB | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REACH | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| JACK HAMMER | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PUSHING & PULLING LBS. | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| OPERATE FOOT CONTROLS | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| DRIVE CAR/TRUCK | ☑ NO RESTRICTIONS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

☐ AUTOMATIC ☐ STANDARD/MANUAL

OTHER PHYSICAL RESTRICTIONS AND/OR INSTRUCTIONS:

LIST ANY RESTRICTIONS AND/OR INSTRUCTIONS RELATED TO ANY PRESCRIPTION MEDICATIONS:

TIME EXAMINATION COMPLETED _finish medecine and return to work 8/8/_

PHYSICIAN'S SIGNATURE: _____      DATE: 8/2/11

NEXT APPOINTMENT DATE: _____    TIME OF NEXT APPOINTMENT:

FORM A-151
06/01/05